[No. 28419. *En Banc.* November 21, 1941.]

REGINA RICHARDSON, as *Administratrix, Respondent,* v. PACIFIC POWER & LIGHT COMPANY *et al.,* *Appellants.*[1]

[1] Reported in 118 P. (2d) 985.

290

*Lehrer & Marquis* (*Laing, Gray & Smith,* of counsel), for appellants.

*Edge, Keith & dePender, Leo N. Cashatt,* and *Glenn L. Bean,* for respondent.

STEINERT, J.—Plaintiff, as administratrix, brought this action in Walla Walla county, Washington, to recover damages for the wrongful death of her husband occasioned in Oregon and resulting from his coming in contact with a broken high tension wire which constituted a part of the power distribution system of defendant Pacific Power & Light Company, hereinafter referred to as the power company. Defendants Don Thompson and Robert Bragg were, respectively, the power foreman and the manager of the power company's Walla Walla division. The cause was tried to a jury, except as to one issue on which, by stipulation of the parties, the evidence was taken, during the

course of the trial, before the court alone. The jury returned a verdict in favor of plaintiff. Defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion was denied in its entirety, and judgment was entered on the verdict. Defendants have appealed.

In their assignments of error, appellants make four contentions, which have been rearranged, for convenience of treatment, as follows: (1) That to enforce the Oregon wrongful death statute in this litigation would be against the public policy of this state; (2) that the decedent was guilty of contributory negligence as a matter of law; (3) that the court erred in giving any instruction on the presumption of due care; and (4) that respondent, for a valuable consideration, had previously executed a general release, thereby barring recovery in the present action.

The facts as the jury was entitled to resolve them from the evidence are as follows: At the time of his death, Frank G. Richardson was thirty-two years of age, was the possessor of an electrical engineering degree from Washington State College, and for ten or eleven years had been an electrician and lineman in the employ of Pacific Telephone & Telegraph Company, hereinafter referred to as the telephone company. Richardson was a competent, steady, reliable, industrious man, and for some time before his death had been receiving a salary of $217.50 per month. He is survived by his wife, respondent herein, and two small sons, who were four and eight years of age, respectively, at the time of the trial.

The power company, in so far as we are here concerned with its activities, was engaged in supplying electric power in a district around the city of Walla Walla and in the northeastern portion of Oregon. It maintained various power lines throughout that area,

one of its lines terminating at a farm in Umatilla county, Oregon, occupied by one George Chapman. It was upon this farm that Richardson met his death.

The particular power line involved in the present action approached the Chapman farm from the south and, after entering the farm, ran approximately due north to a terminal pole and thence to Chapman's house about two hundred feet further north. Since the only part of the power line of any importance in this case is the section between this terminal pole and the pole next adjacent to it to the south, we shall denominate these two poles as the north pole and the south pole respectively. These poles were about thirty feet high and were approximately two hundred seventeen feet apart. The south pole stood on the west side of the Walla Walla river, which meandered through the farm in a generally north and south direction, while the north pole stood on the east side of the stream. The poles were strung with two copper wires carrying sixty-six hundred volts of electricity.

On the east side of the river, at a point about one hundred seventeen feet north of the south pole and about one hundred feet south of the north pole, stood a large tree, referred to in the evidence as the bridge tree because a footbridge crossing the river was anchored to it. At a point thirty-five or forty feet north, and about fifteen or twenty feet west, of the bridge tree was a group of four partly dead cottonwood trees, called snags throughout the trial to distinguish them from the live bridge tree. The wires running from the south pole to the north pole passed between the bridge tree and the four cottonwood trees, and, according to the photographs in evidence, the east wire appears actually to have passed through the branches of the bridge tree. The cottonweed trees, the nearest of which stood from six to twelve feet west of the west wire, were partly dead at the

top; some of the branches extended to and over the wires. Sometimes, when the wind blew, electricity would jump from the power line across to the trees.

About fifty feet north and east of the bridge tree was Chapman's barnyard. At the southwest corner of the barnyard, which was the point nearest the bridge tree, was a gate opening onto a path which led past the tree to the footbridge. From the same corner of the barnyard, and in the area between the bridge tree and the four cottonwood snags, a wagon road ran to and beyond the river, thus passing underneath the power wires.

The telephone company, decedent's employer, also maintained lines throughout the territory around the city of Walla Walla and in the northern part of Oregon. One of these lines crossed appellant company's power line on the Chapman farm. Pursuant to a "contact permit" from the power company, two of the telephone company's wires were attached to the south pole and to two other power line poles still further south. The telephone wires were fastened to brackets affixed to the poles at a point about six feet below the power wires.

Between midnight and one o'clock on the morning of January 3, 1939, there was a severe wind storm in the region around the Chapman farm. The United States weather bureau station in Walla Walla recorded a maximum wind velocity of twenty-eight miles per hour from the west at 12:16 a. m. During this storm, a dead limb fell from one of the snags which stood west of the power line and was found the next morning lying on the ground near the edge of the wagon road. When found, the limb was broken in three pieces, the largest of which was from eight to ten feet long and from six to eight inches in diameter at the larger end. It was also discovered, later in the

same morning, that the east power wire had broken at a point directly above and a little west of the place where the three pieces of the dead limb were found.

After the storm, at about 4:00 a. m., Chapman milked his herd of twenty cows, using an electric milking machine, which seemed to operate as usual at that time. The lights in and around his farmhouse were also functioning then and for some time thereafter. Early in the morning, Chapman had twice forded the river a short distance north of the footbridge, at the point where the wagon road intersected the stream, but he had noticed nothing that would indicate that one of the wires was down. However, it appears from the testimony of an electrical engineer, called as an expert witness, that, even if the wire had been broken during the wind storm in the early morning hours, still if both ends of the broken wire were touching the earth, enough electricity might have passed through the ground to keep the lights and the milking machine on the Chapman farm in operation.

When the decedent reported for work at the Walla Walla office of the telephone company on the morning of January 3, 1939, he was told that there was trouble on the telephone line near the Chapman place, and was given a written repair order directing him to ascertain the cause of the disturbance and repair it. This order recited, under the heading "Trouble Data," that the telephone lines were "crossed with power," indicating that current was leaking from a power wire to the telephone line at some point.

Richardson thereupon drove to the vicinity of the Chapman farm, completing his journey on foot after his car had apparently become stuck in the muddy road. At any rate, he passed through Chapman's barnyard at about 8:45 a. m., and after a short conversation with Chapman, proceeded toward the foot-

bridge, which afforded the only means of access to the south pole, to which the telephone company's wires were attached. Chapman at the same time proceeded toward his house, but just before entering the door he glanced back and noticed that Richardson was then on the footbridge. Chapman then entered the house and began preparations to shave, but in not more than five minutes thereafter, the lights in the house began to flicker, and at the same time his wife, observing a flash from without, called to him: "That man is on fire by the tree!"

Chapman immediately ran in that direction and found Richardson lying on his back in the path leading to the bridge, at a point about ten feet northeast of the bridge tree, with the end of the southern portion of the broken east wire of the power line extending across his chest and grasped in both hands. Richardson had been wearing leather gloves at the time, and the wire had burned through the glove and into the flesh of one hand. Apparently Richardson had been killed instantly upon coming in contact with the wire. Realizing at once that the man was dead, Chapman ran to a nearby farm and summoned a neighbor. On returning to the scene of the accident, and finding that the wire had begun to burn Richardson's clothing, Chapman and the neighbor procured an old inner tube and part of a tree limb, by means of which they removed the wire from Richardson's body.

As indicated above, the broken power wire normally ran to the west of the bridge tree, but after the accident the southern portion of the wire, which was the one that had caused Richardson's death, was found on the east side of the tree. The wire had parted at a point almost directly above that at which the fallen cottonwood limb was found. The northern end of the broken wire lay in a curled condition at the foot and

to the north of the north pole. Later on, about 10:30 a. m., after the sheriff of Walla Walla county and certain employees of the power company and of the telephone company had arrived at the scene, there was found, lying about three or four feet from the bridge tree and somewhat south and east of it, a 2x4 approximately eight or ten feet long, with a nail in one end bent in the shape of a hook. Chapman identified the 2x4 as being part of a hay chopper which had been kept behind his barn, but he gave no explanation, nor was he interrogated, as to how the separated part came to be in the place where it was found. Furthermore, both Chapman and the sheriff testified that they had not noticed the 2x4 when they first examined the ground near the point where Richardson was killed, and that it was first called to their attention by an employee of the telephone company, who had arrived sometime later.

There was no direct evidence as to what broke the wire. It was respondent's theory that it had been broken by the fall of a limb from one of the cottonwood snags west of the power line; appellants' theory, on the other hand, was that the wire had been broken by Richardson himself in attempting to pull on it with the hook fastened to the end of the 2x4.

It appears from the evidence that the telephone company had issued to its employees copies of what is designated as the "Employees' Accident Prevention Code" and also copies of a manual entitled "Bell System Practices," both containing safety rules for the guidance of workmen, with particular reference to work near foreign wires, and to the use of rubber gloves. It further appears that Richardson had copies of these publications in his car at the time of the accident, and that he had attended safety meetings at which such matters had been discussed, so that he was

familiar with these rules and regulations. As already indicated, Richardson at the time of his death was wearing leather, rather than rubber, gloves.

Although appellants in their answer denied the allegations of negligence on their part, no question on that issue is raised by them on the appeal. Instead, apparently conceding their own lack of due care with reference to their maintenance of the power line, they seek to escape liability on the grounds set forth in their assignments of error. The first of these, from the standpoint of logical treatment here, although not actually the first one urged by appellants in their brief, is the contention that the superior court of Walla Walla county, Washington, erred in assuming jurisdiction to enforce the Oregon wrongful death statute. This statute, which has since been amended, provided as follows at the time of the accident:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury done by the same act or omission. Such action shall be commenced within two years after the death, and damages therein shall not exceed $10,000, and the amount recovered, if any, shall be administered as other personal property of the deceased person." Laws of Oregon, 1929, chapter 354, § 1, p. 408.

Appellants' argument in this connection is based upon the provision in the Oregon act that the amount recovered in an action for wrongful death "shall be administered as other personal property of the deceased person." It is claimed that this violates the public policy of Washington as declared in our own wrongful death statutes, Rem. Rev. Stat., §§ 183, 183-1 [P. C. §§ 8259, 8260], which provide, in direct contrast, that all such actions shall be brought *for the benefit of certain specified beneficiaries.*

The question before this court is therefore whether or not this difference between the provisions of the statutes of the respective states is so radical and significant that it must be held that the Oregon statute will not be enforced in our courts because repugnant to the public policy of this state.

■ It is the universal rule that the existence and nature of a cause of action for tort are governed by the law of the place where the alleged wrong was committed. 2 Beale, Conflict of Laws (1935) § 378.2; Goodrich, Conflict of Laws (2d ed. 1938) § 89; Restatement, Conflict of Laws (1934) § 378. This rule applies, of course, to actions for wrongful death. 2 Beale, Conflict of Laws § 391.1; Goodrich, Conflict of Laws § 99; Restatement, Conflict of Laws § 391; *Slater v. Mexican Nat. R. Co.,* 194 U. S. 120, 48 L. Ed. 900, 24 S. Ct. 581.

■ However, since a personal tort claim is transitory in nature,, it is also the general rule that, if a right of action for wrongful death arises under the *lex loci delicti,* it may be sued upon wherever the defendant is subject to suit; and it is ordinarily immaterial that there is no wrongful death statute in the state where the action is brought (a situation which would be hard to find now) or that the statute in the latter state is different from that of the state where the wrong was committed. 2 Beale, Conflict of Laws §§ 392.1, 392.2; Goodrich, Conflict of Laws § 100; Restatement, Conflict of Laws § 392; 16 Am. Jur. 263, Death § 405; *Reynolds v. Day,* 79 Wash. 499, 140 Pac. 681, L. R. A. 1916A, 432; *Dennick v. Central R. Co.,* 103 U. S. 11, 26 L. Ed. 439; *Stewart v. Baltimore & Ohio R. Co.,* 168 U. S. 445, 42 L. Ed. 537, 18 S. Ct. 105; *Lauria v. Du Pont de Nemours & Co.,* 241 Fed. 687; *Rose v. Phillips Packing Co.,* 21 F. Supp. 485; *Hanlon v. Leyland & Co., Ltd.,* 223 Mass. 438, 111 N. E. 907, L. R. A. 1917A, 34; *Powell v. Great Northern R. Co.,*

102 Minn. 448, 113 N. W. 1017; *Loucks v. Standard Oil Co.,* 224 N. Y. 99, 120 N. E. 198; *Whitlow v. Nashville C. & St. L. R. Co.,* 114 Tenn. 344, 84 S. W. 618, 68 L. R. A. 503; Rose, Foreign Enforcement of Actions for Wrongful Death (1935), 33 Mich. L. Rev. 545, 559.

■ There is an exception to this latter general rule, however, which is to the effect that a foreign cause of action will not be enforced where to allow suit thereon would be contrary to the strong public policy of the state in which enforcement is sought. 3 Beale, Conflict of Laws § 612.1; Goodrich, Conflict of Laws §§ 8, 94; Restatement, Conflict of Laws § 612; *Reynolds v. Day, supra; Mertz v. Mertz,* 271 N. Y. 466, 3 N. E. (2d) 597, 108 A. L. R. 1120; *Poling v. Poling,* 116 W. Va. 187, 179 S. E. 604.

■ It is appellants' contention that the instant case comes within this exception denying enforcement to foreign causes of action contrary to the public policy of the forum. Appellants do not deny that respondent's cause of action for her husband's death must be governed by the law of Oregon as it obtained at that time. They argue, rather, that, because this is true, and because the relevant Oregon statute differs from the corresponding statute of this state, it would therefore be contrary to the public policy of Washington to enforce her right of action, and therefore the trial court should have refused to entertain the action at all.

Generally speaking, the public policy of a state is to be found in its constitution, its statutes, and the settled rules laid down by its courts. *Mertz v. Mertz, supra; Poling v. Poling, supra;* 15 C. J. S 854, Conflict of Laws § 4b. In this case, appellants rely solely upon the Washington wrongful death statutes and the cases interpreting them, as demonstrating that the recognition of an action of this character, in which the proceeds are made an asset of the decedent's estate, would

contravene the public policy of this state. Although we recognize the many differences between the statutes of Oregon and those of Washington, as pointed out by appellants, we nevertheless are of the opinion that they are not so significant as to require the courts of this state to refuse to entertain an action based, as this one is, upon the wrongful death act of Oregon in force when Richardson was killed.

It is interesting to note, in passing, that subsequent to the date of Richardson's death, but prior to the institution of this suit, the Oregon statute was amended so as to provide that actions brought thereunder should be, in the first instance, for the benefit of the surviving spouse and dependents of the deceased, and that only in case the deceased leaves no surviving spouse or dependent can there be an action for the benefit of his estate. Oregon Laws, 1939, chapter 466, § 1, Oregon Comp. Laws Ann. (1940) § 8-903. The Oregon law is now, therefore, more nearly in conformity with our own, though it still makes provision for an action on behalf of the deceased's estate under certain circumstances. However, respondent's right of action is determined by the law in effect at the time of Richardson's death, and this subsequent modification of the Oregon statute cannot affect the disposition of the present case.

As has already been pointed out, the mere fact that the *lex loci* and the *lex fori* are different is not enough to justify the courts of the forum in refusing to enforce the statute of the locus of the tort on the ground that it is contrary to the public policy of the state in which suit is brought. In fact, as is stated in *Rose v. Phillips Packing Co., supra,* the modern trend of authority is to disregard the differences between the death statutes of the several states and to give general effect to the law of the state where death occurred, regardless of

the provisions of the statute in force in the state where enforcement is sought. We think that this tendency is a sound and wholesome one, since there is a strong public policy in every jurisdiction "in favor of recognizing and enforcing rights and duties validly created by a foreign law," and consequently the invocation of the public policy of the forum as a bar to the enforcement of foreign rights of action should be very narrowly limited, especially as between the states of the United States, where serious differences are not likely to be found. 3 Beale, Conflict of Laws § 612.1; Goodrich, Conflict of Laws § 8; Restatement, Conflict of Laws § 612, comment (C); *Chicago & E. I. R. Co. v. Rouse,* 178 Ill. 132, 52 N. E. 951; *Herrick v. Minneapolis & St. L. R. Co.,* 31 Minn. 11, 16 N. W. 413, 47 Am. Rep. 771, affirmed in 127 U. S. 210, 32 L. Ed. 109, 8 S. Ct. 1176; *Loucks v. Standard Oil Co., supra;* Beach, Uniform Interstate Enforcement of Vested Rights (1918), 27 Yale L. J. 656, 662; 11 Am. Jur. 302, Conflict of Laws § 6; 15 C. J. S. 855, Conflict of Laws § 4b.

In the *Herrick* case, *supra,* the Minnesota court made the statement and laid down the often quoted rule that:

"It by no means follows that, because the statute of one state differs from the law of another state, therefore it would be held contrary to the policy of the laws of the latter state. . . . To justify a court in refusing to enforce a right of action which accrued under the law of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that, for some other such reason, the enforcement of it would be prejudicial to the general interests of our own citizens."

This court quoted the foregoing language with approval in *Reynolds v. Day, supra,* in which case an action for personal injuries suffered in the course of plaintiff's employment, based upon the common law

of Idaho where the injury occurred, was held to be enforcible in the courts of this state despite the fact that our workmen's compensation act had expressly abolished such actions for injuries suffered in the course of employment in this state. The public policy objection here relied upon by appellants was raised and strongly urged in that case, but was rejected by this court. It was expressly held that a foreign tort claim would be enforced even though the plaintiff could not have recovered had the injury occurred in this state.

In the light of such a rule, it would seem clear that, where the injury complained of would have been actionable had it occurred in Washington, the mere fact that the foreign statute governing the rights growing out of the injury differs from our own local law with respect to the distribution of the proceeds of the action, should not be regarded as a sufficient reason for refusing to permit enforcement of the foreign right in our courts. This in no way interferes with our own internal affairs. It merely recognizes a right of action validly created by the law of the state where the injury occurred and lends the assistance of our courts in enforcing it. There being nothing morally shocking in a statute making the proceeds of such an action an asset of the decedent's estate, and no prejudice to the legitimate interests of our citizens having been demonstrated, we see no reason for denying the relief sought by respondent merely because her action is founded upon a foreign statute differing in detail from our own wrongful death act.

As Judge Cardozo stated in *Loucks v. Standard Oil Co., supra:*

"We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home. Similarity of legislation has indeed this importance: its presence shows beyond question

that the foreign statute does not offend the local policy. But its absence does not prove the contrary. It is not to be exalted into an indispensable condition. . . . The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal."

None of these reasons for refusing access to our courts is to be found in the present case. We therefore conclude our discussion of appellants' first contention by saying that the enforcement of the Oregon wrongful death statute in this action is not against the public policy of the state of Washington.

The second ground for reversal advanced by appellants is the contention that Richardson was guilty of contributory negligence as a matter of law in that he attempted to handle the broken power line without complying with the safety rules prescribed by his employer. Appellants' argument proceeds upon the theory that the basic rules of contributory negligence as expressed by this court are applicable to this case, and we shall likewise proceed upon that theory.

It is well established in this state that the burden of proof upon the issue of contributory negligence is upon the party alleging it. Citation of authority upon that proposition is unnecessary. It was therefore incumbent upon appellants in this case to establish, by a preponderance of the evidence, that Richardson was guilty of acts of contributory negligence proximately causing his death. Having failed to convince the jury on this issue, they now argue that the lower court's judgment, based upon the verdict of the jury, should be reversed on the ground that the evidence so clearly established Richardson's contribu-

tory negligence that the trial court should have taken the issue from the jury and directed a verdict for appellants as a matter of law.

■ Appellants concede that, as a general rule, the question of contributory negligence is one of fact to be decided by the jury; but they contend that the facts of this case bring it within the exception that, in certain cases, the superior court is justified in withdrawing that issue from the jury. It is true that we have recognized such exception. However, it was early stated by this court that contributory negligence may thus be determined as a conclusion of law in only two classes of cases: (1) Where the circumstances of the case are such that the standard of duty is fixed and the measure of duty defined by law, and is the same under all circumstances; and (2) where the facts are undisputed and but one reasonable inference can be drawn from them. *McQuillan v. Seattle,* 10 Wash. 464, 38 Pac. 1119, 45 Am. St. 799; *Burian v. Seattle Electric Co.,* 26 Wash. 606, 67 Pac. 214; *Bell v. Northwest Cities Gas Co.,* 164 Wash. 450, 2 P. (2d) 644; *Scott v. Pacific Power & Light Co.,* 178 Wash. 647, 35 P. (2d) 749; *Hayden v. Colville Valley Nat. Bank,* 180 Wash. 220, 39 P. (2d) 376; *Chadwick v. Ek,* 1 Wn. (2d) 117, 95 P. (2d) 398; *Morris v. Chicago, M., St. P. & Pac. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19. There is no element here of a legally fixed standard of care, hence the question now before us is as to whether or not the case comes within the second of these two categories.

■ The rule with respect to this second branch has frequently been stated by this court as follows: Where, on the evidence in a case and the inferences deducible therefrom, reasonable men may honestly arrive at different conclusions, the question of contributory negligence is for the jury, and cannot be de-

cided as a matter of law by the court. *McQuillan v. Seattle, supra*; *Roberts v. Spokane St. R. Co.*, 23 Wash. 325, 63 Pac. 506, 54 L. R. A. 184; *Burian v. Seattle Electric Co., supra*; *Chisholm v. Seattle Electric Co.*, 27 Wash. 237, 67 Pac. 601; *Lombardi v. Bates & Rogers Const. Co.*, 88 Wash. 243, 152 Pac. 1025; *Scott v. Pacific Power & Light Co., supra*. In resolving the question of contributory negligence, we have also frequently said that the acts of the plaintiff, or of the plaintiff's decedent, must have been so palpably negligent that there can be no two opinions concerning them. *Traver v. Spokane St. R. Co.*, 25 Wash. 225, 65 Pac. 284; *Christianson v. Pacific Bridge Co.*, 27 Wash. 582, 68 Pac. 191; *Walters v. Seattle*, 97 Wash. 657, 167 Pac. 124; *Jackman v. Seattle*, 187 Wash. 446, 60 P. (2d) 78; *Nystuen v. Spokane County*, 194 Wash. 312, 77 P. (2d) 1002; *Bender v. White*, 199 Wash. 510, 92 P. (2d) 268.

Appellants have relied upon one further rule which they contend is relevant to this case. This is to the effect that disobedience by an employee of reasonable rules or orders of his employer constitutes such negligence as will preclude recovery. That rule has received approval in this state. *Brown v. Northern Pac. R. Co.*, 44 Wash. 1, 86 Pac. 1053; *Baucher v. Oregon R. & N. Co.*, 50 Wash. 627, 97 Pac. 661; *Schmidt v. Pelz*, 198 Wash. 80, 87 P. (2d) 278.

The statement of the foregoing rules is simple enough; it is in their application that difficulty is often encountered. We therefore turn our attention to the evidence in the instant case, and to the arguments relied upon by appellants, to determine whether or not the stringent requirements of these rules have been fulfilled, compelling this court to conclude that it was error to allow the question of contributory negligence to go to the jury.

In support of their argument in this connection,

appellants have urged that Richardson was contributorily negligent as a matter of law (1) in attempting to handle the fallen wire without arranging with the power company to de-energize its lines, and (2) in entering the danger zone surrounding the power line without donning rubber gloves, both of these measures being enjoined by the rules of the telephone company referred to above.

The first of these alleged acts of contributory negligence relied upon by appellants rests entirely in the realm of speculation. While it may be accepted as a fact that Richardson took no steps to have the power lines de-energized, there is no direct evidence that he ever attempted *voluntarily* to manipulate the fallen power line. It is true that Chapman testified that he last saw Richardson alive while standing on the footbridge, at a point beyond the place where his body was subsequently found; that, when he reached Richardson after the accident, the wire was lying across the latter's chest, clasped in both hands; and that the only burns on the dead man's body were upon his hands. But these facts are all quite as consistent with Richardson's having come in contact with the wire involuntarily as they are with appellant's theory that he intentionally seized it for the purpose of moving it.

Appellants have made mention of the fact that Richardson was an experienced lineman, and they rely upon that circumstance as imposing upon him a duty to exercise a higher degree of care than is required of laymen not similarly trained. Despite this fact, however, they now contend that this trained electrician, a graduate engineer in fact, must have intentionally grasped the fallen wire (which appellants assert he would instantly have recognized as a high voltage line) and sought to remove it. No reason is suggested why Richardson should deliberately commit an act which

a man of his experience would have clearly recognized as foolhardy, and the presumption of due care, to be discussed later herein, militates against such a suggestion. It is true that appellants' theory constitutes a possible explanation of the facts in the case, but it cannot be said that those facts, which are largely undisputed, compel, as the only reasonable inference therefrom, the conclusion that Richardson actually conducted himself as appellants claim he did.

It is not necessary here to decide whether or not Richardson would have been contributorily negligent as a matter of law if he had in fact voluntarily grasped the power line without first arranging to have it de-energized, because it is not established that he actually did voluntarily grasp the wire. It may be noted that appellants themselves seem to have receded somewhat, in their reply brief, from their initial claim in this respect. They there say that, while it is reasonably clear that Richardson attempted to grasp the wire, the point is not particularly important. Instead, they shift their emphasis to a second alleged act of contributory negligence on Richardson's part.

This second basis for claiming that Richardson was contributorily negligent as a matter of law, and the one upon which appellants ultimately place their greatest reliance, is the fact that he entered what appellants contend he should have realized was a danger zone without wearing the rubber gloves which the rules laid down by his employer required him to wear whenever there was any possibility of coming in contact with high tension power lines. This argument rests on a somewhat different footing from the one just considered, because it is admitted by respondent that Richardson in fact wore no such protective equipment. Hence it only remains to decide what legal conclusion should be drawn from that fact.

It was first argued, in appellants' opening brief, that Richardson was contributorily negligent in taking hold of the power line without donning rubber gloves. That argument, however, is subject to the same objection, already stated, that there is no adequate proof that Richardson did voluntarily seize the wire. In their reply brief, appellants veer from that position and no longer insist that Richardson must have intentionally grasped the wire without rubber gloves. Instead, they claim that his breach of duty occurred, and that he became contributorily negligent, when he entered a danger zone without exercising reasonable precautions for his own safety. In other words, appellants claim that Richardson should have put on rubber gloves upon reaching the Chapman farm and before proceeding in the direction of the power line, because as an experienced lineman he should have realized the possibility that he *might* come in contact with a high tension wire in that vicinity.

This contention, it seems to us, is not maintainable, for the reason that it would have required an excessive degree of care on the part of Richardson under the particular circumstances presented by this record. Of the cases cited by appellants as holding linemen contributorily negligent as a matter of law for failing to obey their employers' rules requiring them to wear rubber gloves, all but one involved accidents in which the injured lineman was immediately and actually engaged in work upon a telephone or power line pole in close proximity to high tension wires. The one exception involved a case in which the deceased lineman had attempted to move a sputtering high tension wire with a hook made of insulated copper wire. Obviously, a higher degree of care should be required under the circumstances involved in those cases than under the circumstances of this case, where Richardson was

killed while still at a considerable distance from the pole upon which he expected to work. We do not consider those cases as controlling authority upon a situation such as obtained here.

Appellants insist that Richardson knew that the telephone wires were crossed with power at some point in the vicinity, that the wires there were highly charged, that there had been a severe wind storm the night before, that the ground near the wires was wet and was therefore a good conductor, and that the rules of his company required the wearing of rubber gloves whenever there was a "possibility of contact with electric wires." They contend that he should have realized that such a possibility existed on the occasion in question and so should have taken the prescribed precautions. But even admitting all the facts recited by appellants, it cannot, in our opinion, be properly said that Richardson's action in crossing the Chapman farm without rubber gloves was so palpably negligent as to require the conclusion, as a matter of law, that it constituted failure to exercise due care. There is some possibility of contact with high tension wires in nearly all work for telephone and power companies, but we think it would be unreasonable to make it contributory negligence *per se* to fail to wear rubber gloves at all times while so employed, regardless of distance from all known and visible high tension wires. We therefore hold that Richardson's acts in proceeding as he did to the point where he had arrived, without rubber gloves, cannot be held to be contributory negligence as a matter of law. The question was one for the jury to determine, and its verdict is conclusive upon that issue.

Appellants' third major contention is that the trial court erred in giving the following instruction on the presumption of due care:

"You are further instructed that when a person is killed in an accident and cannot be present and testify in an action brought on account of his death, the law presumes he exercised the care required of him to avoid the accident and was not guilty of contributory negligence. This presumption can only be overcome by the evidence of disinterested witnesses.

"But if the evidence of disinterested witnesses *satisfies* you that he failed to exercise the due care required of him to avoid the accident and was guilty of contributory negligence, *then* you will give no further consideration to the presumption that he was exercising due care to avoid the accident." (Italics ours.)

■ Appellants excepted to this instruction in the following language:

"We will take an exception to the second paragraph of Instruction Number 9 dealing with the effect of the evidence of a disinterested person as regards the presumption of due care.

"The defendants feel that the instruction should have been added that if there is presented evidence of disinterested witnesses, whether it is believed or not, the presumption fails and they [the jury] cannot consider it."

Upon this appeal, however, appellants have departed from the basis of their exception and now argue that there was no room at all for the presumption in this case, because of the clearness of the evidence that Richardson was violating the rules of his employer, and because of the evidence of the physical facts at, and immediately after, the time of his death. It will be noted, however, that the exception below was limited in scope. It therefore limits the range of argument now open to appellants. By excepting in this particular manner, appellants tacitly admitted the propriety of giving *some* instruction as to the presumption of due care; hence they cannot be heard to controvert that proposition now. It is also to be noted

that appellants did not except to the first paragraph of the instruction; hence the correctness and propriety of that exposition of the law is not now open to attack.

■ In discussing the assignment upon which appellants' present contention is based, we proceed upon the recognized rule that, in suits upon foreign causes of action, all presumptions and inferences of fact, being of a purely procedural character, are governed by the law of the forum. 3 Beale, Conflict of Laws § 595.2; Goodrich, Conflict of Laws § 81; Restatement, Conflict of Laws § 595; 11 Am. Jur. 522, Conflict of Laws § 203. The law of Washington is therefore controlling upon this phase of the case.

■ With reference to the specific ground upon which the particular exception was taken, it must be conceded that as an abstract proposition appellants' contention is sound. It is undoubtedly the rule in this state that the presumption of due care

" . . . entirely disappears from the case upon the introduction of competent and material testimony of disinterested witnesses, as to the actions of the deceased immediately prior to and continuing up to the time of the accident; and where such testimony is introduced, the presumption should in no event be submitted to the jury." *Morris v. Chicago, M., St. P. & Pac. R. Co.*, 1 Wn. (2d) 587, 604, 97 P. (2d) 119, 127, and cases there cited; *Sweazey v. Valley Transport, Inc.*, 6 Wn. (2d) 324, 107 P. (2d) 567.

The second paragraph of the instruction complained of is therefore erroneous because of its suggestion that the evidence of disinterested witnesses must *satisfy* the jury that the deceased failed to exercise due care before such evidence can operate to overcome the presumption. No such limitation upon the force of disinterested testimony obtains; competent evidence by disinterested witnesses, under our deci-

sions, dispels the presumption entirely, whether such evidence is believed by the jury or not.

However, on the facts of this case and in view of the particular exception taken, the specific error complained of is not now ground for reversal. The question raised by appellants' exception relates to the legal effect of "evidence of disinterested witnesses;" but there was no direct evidence, from either interested or disinterested witnesses, as to Richardson's actions at and immediately preceding the time of his death. The only evidence in the record which in any way runs counter to the presumption of due care as expounded in the first paragraph of the instruction, to which no exception was taken, is found in certain testimony concerning Richardson's actions some time before the accident and as to the physical circumstances existing before and after his death. None of that testimony can be classified as direct evidence; to the contrary, it was all of a highly circumstantial character. It is well established that the presumption of due care is not overcome by circumstantial evidence of this sort. *Reinhart v. Oregon-Washington R. & N. Co.,* 174 Wash. 320, 24 P. (2d) 615; *Smith v. Seattle,* 178 Wash. 477, 35 P. (2d) 27; *Morris v. Chicago, M., St. P. & Pac. R. Co., supra.* So, although appellants' exception correctly stated a general principle of law, it had no application to the evidence in this case, and the failure to charge the jury accordingly is therefore not reversible error.

Appellants' final contention is that, in any event, the power company and the telephone company were both *tort-feasors;* and that respondent, having executed a general release in favor of the telephone company, is thereby barred from maintaining this action against appellants. This contention involves the issue

referred to in the early part of this opinion as having been tried to the court alone.

The facts with respect to the alleged release are as follows: Since January 1, 1913, the telephone company has maintained what is designated as a "Plan for Employees' Pensions, Disability Benefits and Death Benefits." The plan, which is managed by a committee appointed by the company's board of directors, pays (1) a service pension upon retirement, based upon years of service and age of the employee; (2) accident disability benefits for injuries occurring in the course of employment with the company; (3) sick benefits; and (4) death benefits. All the provisions with reference to these various benefits are interrelated and, together, constitute the plan. We are, in this case, concerned only with the provisions relating to death benefits.

The plan provides that death benefits shall not exceed five thousand dollars and necessary burial expenses of the employee not in excess of two hundred fifty dollars. All amounts payable for death benefits, as well as for all other benefits provided for in the plan, are charged to the operating expense account of the company when and as paid. Beneficiaries of the death benefits are limited to the wife (or husband) of the employee, dependent children, and other dependent relatives of the deceased. Assignment of benefits is not recognized or permitted by the company. The beneficiary may elect either to accept the death benefits or to prosecute at law any claim that he or she may have against the company. If election is made to accept the benefits, however, then the *beneficiary* must in writing release the company from all claims and demands which *he or she* may have against it otherwise than under the regulations of the plan. Another provision of the plan reads as follows:

"If any persons *other than the beneficiaries* under these Regulations might legally assert claims against the Company on account of the death of the employee, no part of the death benefit under these Regulations shall be due or payable until there have also been delivered to the Committee good and sufficient releases of all claims, arising from or growing out of the death of the employee, *which such other persons* might legally assert against the Company." (Italics ours.)

Under the plan, and upon the death of Frank G. Richardson, there accrued to his widow, Regina Richardson, or to her and the children above mentioned, the sum of five thousand two hundred fifty dollars. That sum was payable to her or to her and the children in their individual capacities, not to the estate of the deceased, nor to the individuals in any representative capacity.

As stated before, however, the regulations required Mrs. Richardson to elect whether she would accept the death benefits or sue the telephone company for damages, and, if she elected to accept the benefits, to release the company from all claims against it by the beneficiaries, and also to obtain a similar release from any person, other than the beneficiaries, who might legally assert such claims against the company.

Mrs. Richardson elected (in the sense hereinafter expressed) to accept the benefits rather than to sue the telephone company, and *as administratrix of the deceased's estate* procured an order from the superior court of Walla Walla county authorizing her to accept the amount designated in the plan. As a condition of payment, however, Mrs. Richardson was required by the company to execute *in her capacity as administratrix* a "Receipt and Release," which contained, among other provisions, the following:

"I acknowledge full satisfaction and discharge of all claims and demands and causes of action of whatever

kind or nature which I, *as administratrix of said estate,* may have against said corporation, and particularly all claims, demands and causes of action of whatever kind and nature by reason of the death of Frank G. Richardson on or about January 3, 1939, while in the employ of said Company, and do hereby elect to accept said benefit payments in lieu of any and all other claim or claims against the said The Pacific Telephone and Telegraph Company, a corporation." (Italics ours.)

The court found, from the evidence submitted to it, that the telephone company was a joint *tort-feasor* with the power company, in that the poles to which the telephone wires were attached were as much the poles of the telephone company as they were of the power company, so far as the decedent was concerned; that the telephone company knew, or ought to have known, of the probability of the breaking of the power wire by the fall of the tops of the dead cottonwood snags, with resultant damages to the telephone line and danger to the employee sent to repair it; that the telephone company owed an equal duty to Richardson to cut down the trees or to remove the power wires; and that it failed to notify the power company, as it should have done, to remove the power wire, which was highly charged with electricity.

Although we have considerable doubt that the evidence justified a finding that the telephone company was a joint *tort-feasor,* we shall, for the purposes of this case, accept the court's findings in that respect as being correct, and will confine ourselves to the legal question of the effect of the release. We shall also assume, as appellants have apparently assumed, that the construction and validity of the release in question are governed by the law of the state of Washington.

It is undoubtedly the rule in this state that the acceptance of a sum of money from one joint *tort-feasor* in satisfaction of a claim for damages, and the

execution of a release of such joint ˙tort-feasor from all damages by reason of the injuries inflicted, operate ·as a release of the other joint tort-feasor, even though the parties to the agreement stipulate that the release of one shall not discharge the other. Abb v. Northern Pacific R. Co., 28˙Wash. 428, 68 Pac. 954, 92 Am. St. 864, 58 L. R. A. 293; Martin v. Cunningham, 93 Wash. 517, 161 Pac. 355, L. R. A. 1918A, 225; Randall v. Gerrick, 93 Wash. 522, 161 Pac. 357, L. R. A. 1918D, 179; Betcher v. Kunz, 112 Wash. 563, 192 Pac. 955; Sunset Copper Co. v. Zickrick, 125 Wash. 565, 217 Pac. 5; Pinkham Lumber Co. v. Woodland State Bank, 156 Wash. 117, 286 Pac. 95; Rust v. Schlaitzer, 175 Wash. 331, 27 P. (2d) 571; Haney v. Cheatham, 8 Wn. (2d) 310, 111 P. (2d) 1003.

These same cases, however, either state or recognize the further rule that it is competent to show that a payment by one wrongdoer was not intended as a satisfaction of a claim against him, and that, in classifying such agreement, whether as a release or as a covenant not to sue, the court looks to its consideration, its effect, and the circumstances attending its execution.

The trial court held that the "release" of the telephone company did not operate to discharge the appellant power company, for two reasons: (1) Because the agreement was, in legal effect, a covenant not to sue, rather than a true general release discharging all, or any, tort-feasors from liability; and (2) because there was no consideration moving to the decedent's estate for the execution of the release. In reaching its conclusion, the court had before it (1) the full details of the benefit plan; (2) respondent's petition, as administratrix of her husband's estate, for authority from the court to settle her claim under the benefit plan, the court's order authorizing such settlement, and the release executed by her pursuant to

such authority; and (3) respondent's testimony, taken before the court in the absence of the jury, giving her reasons for making the settlement and disavowing any claim, or any prior thought of any claim, against the telephone company for liability arising out of tort.

By the published terms of the benefit plan, the telephone company assumed the obligation of paying to certain designated beneficiaries of any employee accidentally killed in the course of his employment a benefit equivalent to three years' wages, but in no event to exceed five thousand dollars plus the reasonable expense of his burial. Such payment was in no way made dependent upon any fault or negligence on the part of the telephone company, nor upon proof of freedom from contributory negligence on the part of the deceased employee. Furthermore, it is clear, from the tenor of the benefit plan in its entirety, that the amounts thus payable were not mere gratuities to be granted or witheld in each case according to the whim or discretion of the officials charged with the administration of the plan. The status of such amounts payable was that of claims held by persons fulfilling the reasonable conditions imposed by the telephone company, and upon the fulfillment of such conditions such persons became entitled to payment as a matter of right. When so paid, the amounts were chargeable to the operating expense account of the company. The obligation to make, and the right to receive, such payments arose out of the contract of employment. The consideration upon which they were based, so far as the company was concerned, was a better personnel relationship between it and its employees, increased employee efficiency, lowered employment turnover, and other advantages of a similar nature. The consideration to the employee was the equivalent of a

deferred payment in the nature of insurance for the benefit of his widow and other dependents.

Upon Richardson's death, therefore, respondent and her children in their individual capacities were entitled to the payment of five thousand two hundred fifty dollars, in accordance with the terms of the benefit plan; and this right, resting in contract, was in no way dependent upon any culpability on the part of the telephone company in connection with the death of the husband and father. Had suit been brought against the telephone company for that amount, it would have had no connection whatever with a wrongful death action based upon tort.

It is true that the telephone company, with a prudent regard for its own interests, required respondent, as administratrix, to sign a written instrument acknowledging receipt of payment of the full amount provided by the benefit plan and, in addition, discharging it from all claims and demands whatever by reason of Richardson's death. It is clear from the evidence, however, that neither in her individual capacity nor in her representative capacity did respondent ever consider that she had any claim sounding in tort against the telephone company. It is also clear from the evidence that she did not make the settlement with that company upon any such basis, and that she never had any idea that the execution of such a release could be construed as a discharge of appellants, whom she did hold accountable for her husband's death. To the contrary, her sole idea was that she was executing the release in order to obtain the payment of a benefit in the nature of insurance.

The very fact that there was no effort to phrase the instrument, or to have it phrased, in such a way as to constitute it a covenant not to sue, rather than as a

release, is persuasive of the conclusion that respondent did not consider the telephone company and the power company as joint *tort-feasors*. Where an injured party releases his claim against one of two or more known joint wrongdoers, he almost invariably tries expressly to reserve his cause of action against the others. Respondent was so far from regarding the telephone company as jointly liable with appellants that she failed to take this customary, though usually ineffectual, precaution.

 We do not hold that the instrument in question was a conventional covenant not to sue, for it lacks many of the characteristics of such an agreement. On the other hand, we are equally convinced that, under the circumstances shown by this record, the instrument should not be construed as a satisfaction and release of *tort-feasors* within the general rule laid down in the cases hereinabove cited. In our opinion, the instrument is to be construed simply as a receipt for money payable to, and accepted by, respondent under the terms of the benefit plan promoted by the telephone company and constituting a contractual obligation; under that construction, we disregard, as wholly extraneous to the subject matter of the settlement, the language in the instrument which might otherwise be held to include the release of any claim or cause of action resting upon a tort liability. This case does not present the aspect of an attempt to obtain for one injury a double recovery from several persons jointly liable therefor. It is more nearly analogous to a situation where an injured person, or his beneficiary, is entitled to recover upon a personal insurance policy and also to seek recovery of damages from the one who caused the injuries or death.

Our conclusion upon this phase of the case has

strong support in the case of *Ridgeway v. Sayre Electric Co.*, 258 Pa. 400, 102 Atl. 123, L. R. A. 1918A, 991, Ann. Cas. 1918D, 1. Suit was there brought for the death of an employee of the Bell Telephone Company as a result of the negligence of defendant Sayre Electric Co. His widow, the plaintiff, had accepted benefits from the telephone company under what was termed "a plan for the payment of pensions and accident and sickness disability benefits to employees and of life insurance to their beneficiaries at time of death." The benefit plan in that case was almost identical with the benefit plan involved here. There was the same provision for death benefits equal to three years' wages, but in no case to exceed five thousand dollars, and the same requirement of a release from all claims arising out of the death of the deceased employee, although the benefit payments were not dependent upon the question of negligence, either on the part of the company or on the part of the employee.

The widow, in that case, also signed the necessary release exacted by the telephone company in consideration of the payment of the benefit to which she was entitled, on the basis of her husband's wages. The defendant electric company then claimed, as do appellants here, that this amounted to the release of a joint *tort-feasor* and therefore operated to bar further proceedings against it. The Pennsylvania court held that it was unnecessary to determine whether or not the Bell Telephone Company was actually a joint *tort-feasor* with the defendant electric company, for the reason that the suit against the latter company was not based on the same cause of action which was the subject matter of the release.

Upon the question of the construction to be placed on the release, the court in that case said:

· "The release, as executed, is broad in its scope and includes a release of claims of any nature that might exist because of the death of her [plaintiff's] husband. . . . Such provision, however, does not necessarily convert the acquittance into a compromise of a claim for damages for tort so far as liability of third persons is concerned. The discharge of such claim was a mere incident to the main purpose of the release, namely, to acknowledge receipt of the benefits due under the insurance fund—a claim solely on the contract of insurance resulting from the relation of employer and employee. No claim was made against the telephone company for negligence, and, if there had been, such demand would have barred plaintiff's right to the insurance fund. The amount so paid was the exact amount to which plaintiff was entitled under the rules relating to the distribution of the fund, and the settlement was without bearing on the question of defendant's liability for negligence, except in so far as the release of such claim was included within the broad general terms of the acquittance. The cause of action which was the subject-matter of the release was the claim on the insurance fund. . . . The payment here was the exact amount of the insurance fund, as stated above, and was made without reference to, or in anywise concerning, an alleged tort; nor is there evidence tending to show the parties dealt otherwise than on a contractual basis, without reference to questions of negligence or responsibility for the action. It cannot be said therefore that plaintiff has obtained satisfaction of her claim for damages from one tortfeasor and hence the reason for the release of the other does not exist. . . . "

The language just quoted states what seems to us the only logical rule which could be applied to a situation such as is presented in the case at bar.

It will be noted, however, that the opinion in that case refers to the death benefits as "life insurance," and appellants therefore contend that upon that basis

the case is to be distinguished from the present case. We are unable to see any material distinction in the two cases. When the opinion in the *Ridgeway* case is read in its entirety, it seems reasonably clear that the benefits there involved differed in no essential from those provided in the plan maintained by Richardson's employer. There seems to have been no premium contribution by the employee in that case, as there was none here. But despite the absence of premium payments by the employee, in the one case or in the other, the benefits in both cases could, in our opinion, properly be called "insurance."

The decision in the *Ridgeway* case was followed in *Southwestern Gas & Electric Co. v. Williams* (C. C. A. 5th), 76 F. (2d) 49, holding that the acceptance by an injured telephone lineman of payments under a pension and benefit plan maintained by his employer, and the signing of a release of the latter from all liability on account of his injuries, did not release his claim against the defendant electric company whose negligence caused his injuries. Appellants have attempted to distinguish the *Williams* case from the *Ridgeway* case on the ground that the benefit plans in the two cases were different; but although there are a few minor differences, we cannot agree with that interpretation of the cases.

The trial court further held that the release did not operate to discharge appellants, because there was no consideration moving to decedent's estate for the execution by the administratrix of the release. The reasoning underlying the court's ruling is somewhat technical, but we think it is entirely sound. It is based upon the fact that, under the Oregon statute, the action for wrongful death belongs to the decedent's estate, in the assets of which the creditors of the estate have an interest prior to those of the heirs of the de-

ceased, while under the terms of the benefit plan the amount payable by the telephone company belonged exclusively to respondent, widow of the deceased, and to her children; creditors would have no claim whatever upon that fund.

According to the provisions of the benefit plan, respondent, in order to obtain the money which belonged to her and her children individually, was required to obtain releases from such "other persons" as might legally assert claims against the telephone company on account of the death of the employee. Any tort action which might have been brought against that company for the death of Richardson would be governed by the laws of Oregon, which required such suit to be brought by the *administratrix of the estate.* The administrator or administratrix, whoever that might be, whether the respondent or some other person, therefore constituted the "other persons" designated in the benefit plan and from whom a release was required to be obtained. Expressed in another way, respondent individually was a *beneficiary* of the benefit fund; as administratrix she was the "other person" who might make some claim against the telephone company.

Pursuant to the requirements imposed by the company, respondent, as an individual, procured a release from herself as administratrix. The consideration, however, for the release, namely, the payment of five thousand two hundred fifty dollars, belonged to, and was appropriated by, respondent and her children in their individual capacities. The estate, in which creditors had a prior interest, got nothing. Hence, as to the estate, there was no consideration for the release, and, so far as this action is concerned, it did not preclude recovery by the representative of the estate upon any action for wrongful death. The mere fact that the

proceeds of the judgment, or some part of it, may ultimately go to the persons who are entitled to the benefit fund, is immaterial.

The judgment is affirmed.

ROBINSON, C. J., BEALS, SIMPSON, JEFFERS, and DRIVER, JJ., concur.

MAIN, MILLARD, and BLAKE, JJ., concur in the result.