[No. 35706. Department One. February 8, 1962.]

KURT TABERT, as *Guardian ad Litem, Respondent,* v. DAVID ZIER *et al., Appellants.*\*

\* Reported in 368 P. (2d) 685.

*Palmer, Willis & McArdle,* for appellants.

*Gavin, Robinson & Kendrick* and *Robert R. Redman,* for respondent.

HILL, J.—This is an action for personal injuries sustained by a minor, employed to stack baled hay, when a hay elevator collapsed on him. The appeal is by the defendants from a judgment entered on the verdict of the jury.

An understanding of the operation of the machinery involved is necessary to any consideration of the questions of negligence, contributory negligence, and assumption of risk with which we are concerned.

The inclined chute (shown in the picture on the opposite page) is thirty feet, six inches long and twenty inches wide. A moving conveyor belt operates in the chute and carries bales of hay to the higher levels of a stack to which they could not be conveniently lifted by hand. The conveyor belt is powered from a tractor.

At the lower end of the chute, where the bales are placed on the conveyor belt, is a roller which rests on the ground; it can be seen in the picture. The upper end would be resting on the hay stack when in use.

The angle of elevation of the chute must be changed from time to time as the stack gets higher, and this angle of elevation is regulated by a hand-operated mechanism described by the appellant as follows (some minor changes in wording having been made):

It consists of two bracings or "frames" which support the chute, and also consists of a winch by which the chute is hand-cranked up or down as necessity requires—the

A

B

cables of the winch being attached to these frames. These frames are designated in the sketch as "A" and "B" and we will so refer to them.

The "B" frame extends from the wheel axle back toward the lower end of the chute. This is the anchor frame, *i.e.*, it is so connected as to be immovable with respect to its position on the chute, although it is so hinged both to the chute and the wheel axle that the angle of tilt changes as the chute is raised or lowered.

The "A" frame extends from the wheel axle and is the forward support of the chute. This frame is not fixed at the point where it supports the chute, instead the chute rests on small wheels at the upper end of each arm of the "A" frame; this permits the "A" frame to roll forward or backward along the bottom of the chute as the operator raises or lowers it. To raise the chute, the winch is cranked to the right, which shortens the cables between "A" and "B" frames, and raises the "A" frame toward the perpendicular position; to lower it, the winch is cranked (or uncranked) to the left, lengthening the cables between the "A" and "B" frames and lowering the "A" frame forward. When the elevator is raised to the height shown in the picture, the "A" frame is a little short of being perpendicular. (The defendant fixes this as the position of the elevator at the time of the collapse; the plaintiff says the elevated end was not so high.) The weight of the chute keeps the "A" frame from falling backwards toward the "B" frame, and the tension of the cables keeps the "A" frame from falling forward.

Such a winch is supposed to be equipped with a pawl and ratchet wheel to prevent the unwinding of the winch. (Whether there was such a pawl on this winch or, if there was, whether it was working, was one of the fact questions in this case. The pawl was referred to throughout the testimony as a "dog," and we shall use that appellation.) There was a short length of baling wire hooked around the crank handle and anchored to the "B" frame. (Whether this was an adequate substitute for the "dog,"

if it was in fact missing or nonoperative, was likewise disputed.)

The plaintiff and his twin brother, then sixteen years of age, were hired by the defendant David Zier (who will be referred to as though he were the sole defendant) to stack baled hay on his ranch. The others assigned to that particular crew were the defendant's fourteen-year-old son, Ed Zier, and Andrew Montgomery; the latter worked for the defendant and his brother. Although an adult, Montgomery exercised no control or direction over the operation and was in no sense a supervisor or foreman. After a period of manual stacking, the stack then being seven to nine bales high on one end and perhaps twelve on the other, the defendant secured the hay elevator belonging to his brother to carry the bales of hay up to higher levels on the stack. The defendant, with all members of the crew, set the elevator up with the upper end of the chute resting against the stack. This was accomplished at about 11:00 a. m. The defendant connected the conveyor belt to the tractor's power takeoff and found that it was working properly. He then left, and the extent of his supervision of the stacking thereafter, until the plaintiff was injured at about 3:00 p. m., is in controversy.

What he said the last time he talked to the crew became one of the most important issues in the case. The defendant's testimony was that he said, "Don't move that elevator until I get back," and that it was a positive command. The plaintiff's version was that the defendant said, "We will move the elevator when I get back," and that the defendant, at the same time, instructed the plaintiff to "top off" the stack, he having had experience in doing that part of the job. The plaintiff did not construe this as a command not to move the elevator.

The plaintiff testified that around 3:00 p. m. the stack had been built up to a height of fourteen bales for its full width and length, and terraced (or stairstepped, which is referred to as "topping" the stack) back to a top row eighteen or nineteen bales in height. Several unplaced

bales were left on top of the stack to fill in, where the chute had been resting, after the elevator was moved. (Different witnesses gave different versions as to the height of the stack.)

The plaintiff or his brother had, during that time (since 11:00 a. m.), winched up the chute several times as the stack got higher. They both said the elevator had been moved from one location to another between 11:00 a. m. and 3:00 p. m.; the move being without mishap. However, Ed Zier and Montgomery said there was only one attempt to move the elevator, and it was at that time that the plaintiff was injured. Whether this ill-fated move was over the protest of Ed Zier and Montgomery is disputed, but in any event, all members of the crew were cooperating in moving the elevator when it collapsed. It was pushed back from the stack from three to five feet, and at the same time, turned to clear the stack.

The plaintiff was pushing back on the "A" frame, i.e., toward the "B" frame; this put him under the elevated portion of the chute. Ed Zier was pushing on one of the wheels to turn the elevator away from the stack and was also under the chute. The other two members of the crew (Bob Tabert and Montgomery) were lifting the bottom of the chute off of the ground, ten inches or a foot, and assisting in the turning. The chute, when clear of the haystack, started to tip. There was testimony that it tipped until the upper end of the chute hit the ground and then collapsed. The plaintiff saw his brother going upward as the bottom of the chute rose and the elevated end tilted downward. He thought he could hold up the elevated end of the chute, but instead of merely tilting on the fulcrum of the "A" frame, like a teeter-totter, the chute fell to the ground pinning the plaintiff beneath it. Whether the "A" frame fell forward or backward became a matter of significant importance, as will be indicated later in this opinion.

■ For the most part, the appeal is an attempt to persuade this court to substitute its judgment for that of the

jury on disputed facts, which we, of course, decline to do. *Davis v. Bader* (1961), 57 Wn. (2d) 871, 360 P. (2d) 352, and cases cited.

█ The collapse of the elevator raised a permissible inference of negligence that took that issue to the jury (res ipsa loquitur); and the negligence of the defendant, on the issue of inadequate instruction or supervision was, likewise, a jury question.

The contributory negligence of the plaintiff or his assumption of the risk were also jury questions.

The specific claim of negligence because of a missing "dog" and of an inadequate safety device to control the workings of the winch, presented a dispute of fact for the jury's consideration, if there was evidence that such negligence was a proximate cause of the collapse of the elevator. The defendant's contention that there was no credible evidence from which the jury could find proximate cause will be discussed hereafter.

Only four contentions of the defendant warrant discussion:

DID THE PLAINTIFF DISOBEY A COMMAND BY THE DEFENDANT?

We have heretofore indicated the different versions as to what the defendant said the last time he talked to the crew before the accident.

█ If the plaintiff disobeyed a positive command not to move the elevator until the defendant returned, the plaintiff was, as a matter of law, contributorily negligent (*Richardson v. Pacific Power & Light Co.* (1941), 11 Wn. (2d) 288, 118 P. (2d) 985; *Schmidt v. Pelz* (1939), 198 Wash. 80, 87 P. (2d) 278), and the jury was so instructed.

█ The jury was likewise instructed that if the defendant's statement was that the elevator would be moved when he returned and that if such a statement could be construed as equivocal and not a positive command, or if he accompanied his order not to move the elevator with another order to "top off" the stack, and that an employee of the age and experience of the plaintiff would reasonably

believe that topping off the stack required the moving of the elevator, then the plaintiff was not barred from recovering simply because he moved or participated in the moving of the elevator. This instruction was likewise correct. *Shepard v. Payne* (1922), 60 Utah 140, 206 Pac. 1098; *Texas & Pac. R. Co. v. Leighty* (1895), 88 Tex. 604, 32 S. W. 515.

█ The trial court properly instructed on both the plaintiff's and defendant's position relative to what the defendant said and what the plaintiff understood, or should have understood, therefrom. The situation presented a jury question; and not the basis for a holding, as the defendant so strenuously urges, that the plaintiff was contributorily negligent as a matter of law.

WERE THE PRINCIPLES OF PHYSICS INVOLVED SO OBVIOUS THAT THE DEFENDANT MUST BE HELD TO HAVE ASSUMED THE RISK OF THE OPERATION?

This contention is stated in the words of the appellant's (defendant's) brief:

"If the collapsing of the elevator, as testified to by respondent, was foreseeable by appellant, it was equally foreseeable by respondent. For there was clearly nothing technical or magical about this accident. As previously shown, this was a simple situation of a heavy elevator, whose elevated end was supported several feet off the ground by a frame of rollers (the A-frame). Appellant contends that it is common knowledge, and the trial court should have so ruled, that if one 'spins' such a rig, the heavy elevated end will tend to fly from its moorings, . . . especially where one pushes on the supporting frame while the 'spinning' is going on as respondent admittedly did in this case."

"The principles of the rig are simple physical principles, such as those of the pulley, the lever and the fulcrum. And in the moving of the elevator as the uncontradicted evidence shows it was moved, simple physical forces were involved, such as gravitation and momentum."

We will assume, with counsel, that all members of this court would have had sufficient. perspicacity to realize that the procedure adopted in moving the hay elevator

would result in its collapse. It is significant that none of the other members of the crew—two more nearly the peers of the plaintiff in the matter of age, all three more nearly his peers in the matter of experience with farm machinery—apparently did not foresee what the defendant urges was inevitable, and none gave warning of the peril until the hay elevator was in the act of collapsing.

■ The plaintiff, being a minor, would only be required to assume those ordinary risks of the service which would be obvious to, or pointed out in a manner suited to, the comprehension of a youth of similar age, judgment and experience. Whether the plaintiff assumed this particular risk was a question for the jury. *Ludwig v. Kirby* (1951), 13 N. J. Super. 116, 80 A. (2d) 239; *Holbert v. Slaughter* (1956), 227 Ark. 144, 296 S. W. (2d) 402; *Cathey v. DeWeese* (1956) (Mo.), 289 S. W. (2d) 51. In the latter case it is said (p. 55):

" . . . It is obvious from the record that Leon was a boy of average intelligence with such formal learning as a ninth grade education provides. But even a resourceful seventeen year old boy with a ninth grade education is not to be generally adjudged by the standards of care applicable to an adult, after a mere three weeks' use of complicated modern farm machinery. . . ."

### DID THE PLAINTIFF ASSUME THE RISK BY REMAINING UNDER THE CHUTE WHEN HE SAW IT COMING DOWN?

It is further urged that the plaintiff assumed the risk when he did not get out from under the chute when he knew that it was tilting and falling, but attempted to hold it up.

What the defendant overlooks, in making this argument, is that while the plaintiff had seen the chute on a hay elevator tip and the top go down and the bottom come up, he had no reason or basis for knowing that it would collapse completely, as it did in this instance, with the entire chute falling to the ground.

■ One does not assume a risk of which he has no knowledge, and whether the plaintiff should or should

not have appreciated the danger of this particular collapse was an issue upon which reasonable minds might differ, and it was properly left to the jury. *Blanco v. Sun Ranches, Inc.* (1951), 38 Wn. (2d) 894, 234 P. (2d) 499.

Re: Instructions Generally:

The defendant assigns error to eleven instructions given by the trial court and to the trial court's refusal to give four requested instructions.

The complaint, generally, about the instructions given is not that they incorrectly state the law, but that they are not applicable, since the case should not have been submitted to the jury inasmuch as (a) there was no evidence of negligence; (b) there was contributory negligence or assumption of risk, as a matter of law, either because a positive order was disobeyed, or that the methods used by the plaintiff in moving the elevator invited the catastrophe. With our determination that the evidence made jury questions of negligence, contributory negligence, and assumption of risk, the exceptions to the instructions given and requested are, for the most part, disposed of.

Two do require consideration; and one presents what is, for us, the most difficult issue in the case, *i.e.*,

Was There Evidence That Defective Safeguards to Prevent the Unwinding of the Winch Were a Proximate Cause of Its Collapse?

The mechanism for changing the angle of elevation of the chute was, we have seen, a winch which lengthened or shortened the cables between the "A" frame and the "B" frame. We have referred to the claimed "missing dog" and the baling wire hooked around the winch handle.

The trial court, in instruction No. 11, designated as one of the plaintiff's claims of negligence that the defendant had furnished

". . . a hay loading elevator which was faulty and defective in that there was no working dog or safety device on the gearing connected with the handle adequate to keep the elevator from collapsing in event it became overbalanced while being moved or used."

Whether that instruction should have been given

presents the closest question in the case. If we assume, as plaintiff insists, that there was no "dog" and the baling wire was not an adequate safety device, and that the negligence of the defendant in that regard is clearly established, there yet remains the issue of whether there was evidence that such negligence was a proximate cause of the collapse of the hay elevator.

If the "A" frame fell forward, the cables which connected it to the "B" frame must have unwound, and a defective safety device could be responsible and, hence, a proximate cause of the collapse. If the "A" frame fell backward toward the "B" frame, the defective safety device could have had no bearing on the collapse and could not have been a proximate cause.

The defendant and the witnesses, Henry Zier, Jesse Waters, and James Eaton, all testified that when they examined the collapsed elevator they found that the "A" frame had fallen back toward the "B" frame.

The only witness that testified that the "A" frame fell forward was the plaintiff's brother, who said on direct examination that the "A" frame went forward and the "B" frame remained where it was, and that it "just sort of opened up." On cross-examination, the following questions were asked and answers given:

"Q. And, really, you don't know whether the A-frame went farther toward the lower end, toward the B-frame, or whether it fell forward toward the elevated end, do you? I mean from your own personal observation? Do you know that? A. I don't know it for a fact, no. Q. And, you have no knowledge at all whether or not the cable remained in good shape and the wire remained in good shape, or just exactly what happened? A. I never checked the cable or the wire. Q. So you have no knowledge, then, of just what did happen as it collapsed. A. No."

The plaintiff testified that after the chute fell on him:

"I can't remember, I didn't really look at it too close, but it seems that the A-bar was across me, but I couldn't be sure about it because I wasn't worried about that."

This seems to us more than a scintilla of evidence that

the "A" frame fell forward toward the elevated end of the chute, but very little more; and the jury had to disbelieve the four witnesses who testified to the contrary. This court does not believe that the "A" frame fell forward, but we cannot say all reasonable minds must reach the same result, as we were able to say in *Neel v. Henne* (1948), 30 Wn. (2d) 24, 190 P. (2d) 775; hence we cannot say that the trial court erred in submitting the issues of whether there was negligence in failing to have a "dog" or adequate substitute as a safety device; and, if so, whether it was a proximate cause of the collapse of the elevator; and whether, knowing of the defect or defects, the plaintiff assumed the risk thereof.

### Should the Instruction on "Rescue" Have Been Given?

The defendant's argument is brief; it was that

"There was nothing in respondent's testimony indicating that he was trying to protect or rescue his brother when he attempted to stop the falling elevator by the strength of his hands and arms alone. Furthermore, as stated above, the brother could have jumped off at any time. He was not trapped in any sense of that word, as is the situation in the classic case where the rescue doctrine applies. See *French v. Chase*, 48 Wash. (2d) 825, where the rescuee was pinned beneath a car."

■ The plaintiff saw his brother being carried upward on the tilting chute, and his brother rode the lower end of the chute until the other end hit the ground and it collapsed. Everything happened in a matter of split seconds. Had the plaintiff been permitted the retrospective view of counsel, he could have concluded that his brother was not trapped and that he could extricate himself from his difficulty. He might have realized too, given time, that the lower end of the chute (as shown in the picture and sketch) could go no higher than the length of the "B" frame would permit, as it was fastened both to the axle and the chute. The plaintiff's decision, however, was instinctive and instantaneous. From other testimony the jury could conclude that the seeming peril was the result of the negligence of

the defendant. As said in *Wagner v. International R. Co.* (1921), 232 N. Y. 176, 181, 133 N. E. 437, 19 A. L. R. 1:

" . . . The law does not discriminate between the rescuer oblivious of peril and the one who counts the cost. It is enough that the act, whether impulsive or deliberate, is the child of the occasion."

The rescue instruction was proper.

Other exceptions, relative to instructions given or requested, have been answered by what has heretofore been said in the opinion.

Our apparent skepticism, as to the establishment of proximate cause with relation to one of the grounds of claimed negligence, is not to be misconstrued as any reflection on the plaintiff's case or his right to recover. We are satisfied that entirely apart from that claimed ground of negligence, this was a proper case to go to the jury on the basis of res ipsa loquitur, and that the jury could, from all the circumstances, properly draw an inference of negligence against the defendant.

The judgment is affirmed.

FINLEY, C. J., WEAVER, ROSELLINI, and FOSTER, JJ., concur.