[No. 67267-3-I.    Division One.    October 29, 2012.]

BELLEVUE PACIFIC CENTER LIMITED PARTNERSHIP, *Respondent*, v.
BELLEVUE PACIFIC TOWER CONDOMINIUM OWNERS ASSOCIATION,
*Appellant*.

Christopher I. Brain, Mary B. Reiten, and *Shannon M. Whitemore* (of *Tousley Brain Stephens PLLC*), for appellant.

*Henry C. Jameson* (of *Jameson Babbitt Stites & Lombard PLLC*), for respondent.

¶1 Cox, J. — At issue in this case is the right to control nine parking spaces located in the courtyard at the main entrance of the Bellevue Pacific Tower Condominium. The trial court properly granted partial summary judgment to Bellevue Pacific Center Limited Partnership (LP), dismissing with prejudice the counterclaims of the Bellevue Pacific Tower Condominium Owners Association (Tower COA).[1] And the court properly ruled that Tower COA could not present its affirmative defenses at trial. Finally, the trial court did not abuse its discretion in awarding the amount of attorney fees to LP against Tower COA that it determined at the conclusion of trial. We affirm.

¶2 Bellevue Pacific Tower Condominium is a residential condominium. It is part of a mixed-use condominium known as Bellevue Pacific Center Condominium. The latter condominium is comprised of a "Residential Unit" (Bellevue Pacific Tower Condominium), a "Commercial Unit," and a "Garage Unit."

¶3 LP is the developer of these properties and the declarant for each of the declarations establishing Bellevue Pacific Center Condominium and Bellevue Pacific Tower Condominium. LP recorded these two declarations in 1995. They bear recording numbers that are very close to each other.

¶4 The declaration for Bellevue Pacific Tower (the Tower Declaration) and the declaration for Bellevue Pacific Center (the Center Declaration) both contain terms and conditions for parking. It is undisputed that there are a total of 492 parking spaces within Bellevue Pacific Center, 483 of which are enclosed in the parking garage and 9 of which are

---

[1] We adopt the naming conventions of the parties.

in the exposed courtyard at the main entrance of Bellevue Pacific Tower. Of the above totals, there are 131 parking spaces for Bellevue Pacific Tower, 122 of which are enclosed. The remaining 9 are in the courtyard at the main entrance. There are 171 individual residential units within Bellevue Pacific Tower.

¶5  In April 2000, Tower COA executed a lease with LP's agent, renting four of the nine courtyard parking spaces for use by the Tower residents.[2] The lease was for a term of one year and was automatically renewable on a month to month basis thereafter.[3] Tower COA paid LP rent on these four stalls from April 2000 through November 2007.[4] It failed to pay rent thereafter.

¶6  Two individual residential condominium unit owners also rented two more of the nine courtyard stalls from LP's agent from 2000 to 2005.[5] These were also leased on a month to month basis.

¶7  In 2001, Tower COA sued LP over disputes arising from conflicting interpretations of the terms and conditions of the Tower Declaration and the Center Declaration. In September 2003, the parties settled that litigation. They executed a "Memorandum of Understanding Regarding Settlement" dated September 16, 2003, as well as other documents to memorialize their agreement. Among other things, the parties agreed in the memorandum to release each other "from any and all claims which have been or *could have been asserted in the [litigation]*."[6]

¶8  In 2008, Tower COA wrote to LP and claimed that it had the right to control all nine of the courtyard parking spaces at the main entrance of Bellevue Pacific Tower. LP

---

[2] Clerk's Papers at 288, 850.

[3] *Id.*

[4] *Id.* at 850.

[5] *Id.* at 335, 850.

[6] *Id.* at 348 (emphasis added).

disagreed. Each party then took a series of steps to assert their respective claims to the courtyard parking spaces.

¶9 In 2009, LP commenced this action against Tower COA to obtain a declaration of its right to control the nine courtyard parking spaces and to eject Tower COA from them. LP also sought damages and attorney fees both under the terms of the month to month lease and under the Washington Condominium Act, chapter 64.34 RCW. Tower COA asserted affirmative defenses and counterclaims, which we discuss in more detail later in this opinion. LP asserted the release in the 2003 settlement agreement as a bar to Tower COA's affirmative defenses and counterclaims.

¶10 The trial court granted LP's partial summary judgment motion and dismissed Tower COA's counterclaims with prejudice. Tower COA moved for reconsideration, and the court denied this motion.

¶11 After a bench trial, the trial court awarded LP damages against Tower COA for unpaid rent for the courtyard parking spaces that it rented. The court also awarded attorney fees to LP based on both the lease Tower COA had signed and RCW 64.34.455.

¶12 This appeal followed.

## SETTLEMENT AGREEMENT

¶13 Tower COA argues that the trial court should not have granted partial summary judgment to LP, dismissing with prejudice its counterclaims. We hold that summary judgment was appropriate and dismissal of Tower COA's counterclaims and affirmative defenses was correct.

¶14 An order granting summary judgment should be affirmed if no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law.[7] Summary judgment orders are reviewed de novo, taking

---

[7] CR 56(c).

evidence and all reasonable inferences from it in the light most favorable to the nonmoving party.[8]

## RCW 64.34.030

■■■ ¶15 In its partial summary judgment order, the trial court relied on the 2003 release signed by Tower COA and LP as a bar to all of Tower COA's claims. Tower COA argues that the 2003 settlement agreement with LP does not bar the claims that it asserts in this litigation. Specifically, it contends that RCW 64.34.030 of the Washington Condominium Act bars enforcement of the release in the settlement agreement against individual condominium unit owners who comprise Tower COA. We disagree.

¶16 RCW 64.34.030 provides as follows:

> Except as expressly provided in this chapter, provisions of this chapter may not be varied by agreement, and ***rights conferred by this chapter may not be waived***. A declarant may not act under a power of attorney or use other device to evade the limitations or prohibitions of this chapter or the declaration.[9]

¶17 The settlement agreement on which LP and the trial court relied to bar Tower COA's claims states in relevant part:

> This agreement, dated for reference purpose as of September 16, 2003, is between . . . Bellevue Pacific Tower COA [Tower COA], Bellevue Pacific Center Limited Partnership [LP] . . . and is intended as an outline of settlement of litigation currently pending between the parties . . . .
>
> 1. ***Claims excluded***—the parties are not settling and reserve the right to further litigate these issues: (1) Tower's claim that (a) the voting allocation contained in Center's declaration of one vote for each of the three units comprising Center violates the Washington Condominium Act, (b) that a representative on Center's board other than a representative of Tower's

---

[8] *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

[9] (Emphasis added.)

board violates the Washington Condominium Act, and (2) Center's claim for judicial reformation of Center's declaration because the square footage of the P-1 portion of the garage is not included in the total square footage of the building and the Residential Unit for purposes of allocating expenses under Schedule B of Center's declaration. Neither party will assert that the resolution of such issues has any retroactive effect on matters settled herein.

2. *Except as to the claims excluded*, and subject to the other terms of this agreement, each party releases every other party from any and all claims which have been or *could have been asserted in the lawsuit* . . . .[10]

¶18 We start with the observation that RCW 64.34.304 enumerates certain powers of a condominium owners' association. Specifically, this statute states that an association may:

(d) *Institute, defend, or intervene in litigation* or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium;

(e) *Make contracts* and incur liabilities.[11]

¶19 The plain words of this statute make clear that Tower COA had the power to settle the prior litigation when it executed the contract containing the release in 2003. Moreover, we have previously recognized that the Washington Condominium Act does not prevent or limit the power of an owners' association from settling disputes. "[N]othing in the language of RCW 64.34.030 and .100 prevents parties from mediating or otherwise settling their disputes in any manner they wish, including nonbinding arbitration. The [Washington Condominium Act] restricts only parties' abil-

---

[10] Clerk's Papers at 348 (emphasis added).

[11] (Emphasis added.)

ity to abrogate enforcement of its terms by judicial proceeding should alternative methods of dispute resolution fail."[12]

¶20 Tower COA does not and cannot attack, on its own behalf, the settlement and release that it signed in 2003. That is because the plain language of the above statute clearly states that it had the authority to sign that document. Rather, it argues that the settlement and release cannot be enforced against the individual condominium unit owners that comprise the association. This argument is plainly wrong.

¶21 There are no Washington cases that address releases and settlement agreements in the context of the Washington Condominium Act. But there is no reason to believe that the legal principles that generally apply to settlement agreements are any different in this context.

¶22 Generally, a " 'settlement is a compromise voluntarily agreed to by the parties. Each party generally accepts something less than that to which he believes he is entitled based on a decision that the compromise is more advantageous to him than the sum of the risks and benefits involved in pursuing the claim.' "[13] "Each party's promise in the new agreement is supported by an entirely new consideration—the return promise of the other. And so the accord is enforceable as a contractual agreement in its own right. It *cuts off all defenses and arguments based on the underlying contract*."[14]

¶23 *Chadwick v. Northwest Airlines, Inc.*[15] applies these principles to the effect of a release in a settlement agreement on a later employment discrimination claim. There,

---

[12] *Marina Cove Condo. Owners Ass'n v. Isabella Estates*, 109 Wn. App. 230, 237, 34 P.3d 870 (2001), *abrogated on other grounds by Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 799 n.13, 225 P.3d 213 (2009).

[13] *Chadwick v. Nw. Airlines, Inc.*, 33 Wn. App. 297, 301, 654 P.2d 1215 (1982) (quoting *Strozier v. Gen. Motors Corp.*, 635 F.2d 424, 425-26 (5th Cir. 1981)).

[14] *Or. Mut. Ins. Co. v. Barton*, 109 Wn. App. 405, 413-14, 36 P.3d 1065 (2001) (citations omitted).

[15] 33 Wn. App. 297, 654 P.2d 1215 (1982).

Chadwick alleged that he was denied the sick leave Northwest Airlines provided other similarly situated employees because of his physical handicap.[16] Northwest Airlines argued that Chadwick's discrimination claim was barred by a previous settlement agreement signed after Chadwick had filed a grievance against the company.[17] In the agreement, Chadwick agreed he could "not . . . file or process any unemployment compensation, Workmen's Compensation, *discrimination or other claims of any nature against the Company in any form as a result of his resignation or reinstatement hereunder.*"[18] In his second lawsuit Chadwick contended that the settlement agreement violated the public policy favoring the elimination of discrimination against the handicapped. The court rejected this claim:

> It is well established settlements are strongly favored and are to be encouraged. We find no authority for adopting a rule that per se voids a settlement simply because it involves a possible discrimination claim. In fact, federal cases interpreting Title VII of the Civil Rights Act of 1964 . . . consistently favor settlement and conciliation of discrimination claims.[19]

Though there is a strong public policy favoring the elimination of discrimination,[20] the *Chadwick* court held that the long-standing policy favoring settlements outweighed the policy in that case.[21]

¶24 Here, as in *Chadwick*, notwithstanding the underlying policy of enforcing protections of the Washington Condominium Act, the principle of finality of settlements out-

---

[16] *Id.* at 298-99.

[17] *Id.* at 299.

[18] *Id.* (some emphasis added) (alteration in original).

[19] *Id.* at 300 (citations omitted).

[20] *See Roberts v. Dudley*, 140 Wn.2d 58, 62 n.2, 993 P.2d 901 (2000) (noting that Washington statutory and legal precedent all "evidence a strong and clear public policy against discrimination").

[21] *Chadwick*, 33 Wn. App. at 300-01.

weighs any arguments to the contrary. Our conclusion is buttressed by a Texas case that considered the question now before us. That case is *Jistel v. Tiffany Trail Owners' Ass'n.*[22]

¶25 The Washington Condominium Act is substantially adopted from the Uniform Condominium Act, 7 pt. 2 U.L.A. 485 (2009).[23] Thus, cases outside of Washington construing the same or similar provisions can also be helpful. *Jistel* is such a case.

¶26 In *Jistel*, the Texas court of appeals held that the waiver provision of the Texas property code did not preclude the effect of a release.[24] There, Jistel sued Tiffany Trail in 2000 over repairs he said it was required to make.[25] Jistel and Tiffany Trail settled this suit.[26] As part of the settlement agreement, Jistel agreed to dismiss the suit, and the 2000 trial court "entered an order dismissing Jistel's claims against Tiffany Trail with prejudice."[27] Jistel again sued Tiffany Trail in 2002 over the same repair issues that had been settled in 2000.[28] But Jistel argued his suit was not barred by the release because the

> provisions of the Uniform Condominium Act and Tiffany Trail's condominium declaration imposed an ongoing responsibility on the part of Tiffany Trail to make the repairs. Jistel asserted that, pursuant to [the Uniform Condominium Act, as adopted by Texas], Tiffany Trail's ongoing obligation to make the repairs could not be limited or waived by agreement.[29]

---

[22] 215 S.W.3d 474 (Tex. App. 2006).

[23] *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate*, 148 Wn.2d 319, 328 n.7, 61 P.3d 1094 (2002).

[24] *Jistel*, 215 S.W.3d at 482.

[25] *Id.* at 477-78.

[26] *Id.* at 478.

[27] *Id.* at 481.

[28] *Id.* at 477.

[29] *Id.* at 478 (citation omitted).

¶27 Jistel relied upon the language of Texas Property Code § 82.004, taken from the Uniform Condominium Act, and argued that he could not waive his rights to repairs given § 82.004. This section mirrors the Uniform Condominium Act nonwaiver provision. It states:

> Except as expressly provided by this chapter, provisions of this chapter may not be varied by agreement, and rights conferred by this chapter may not be waived. A person may not act under a power of attorney or use any other device to evade the limitations or prohibitions of this chapter or the declaration.[30]

¶28 The *Jistel* court concluded, however, that the above provision did not obviate the effect of Jistel's prior settlement agreement with Tiffany Trail.[31] "Jistel chose to settle the 2000 suit and to dismiss the suit instead of going to trial. Nothing in the language of Section 82.004 of the Property Code prohibits parties from settling existing, disputed claims in any manner they wish to settle them."[32] The court then noted the important policy rationale supporting the enforcement of settlement agreements.[33]

> Construing Section 82.004 [as Jistel argues] would violate this State's policy of encouraging the "peaceable resolution of disputes" and "the early settlement of pending litigation through voluntary settlement procedures." It would also lead to great uncertainty in the finality of settlement agreements and judgments. Finally, such a construction would lead to unfair results, as is illustrated by this case. Jistel accepted the benefits under the settlement agreement.[34]

---

[30] Tex. Prop. Code Ann. § 82.004 (2007).

[31] *Jistel*, 215 S.W.3d at 482.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 482 (quoting Tex. Civ. Prac. & Rem. Code § 154.002).

Thus, the *Jistel* court held that the nonwaiver provision of the Texas Property Code did not defeat the enforceability of Jistel and Tiffany Trail's previous settlement agreement.[35]

¶29 Here, both LP and Tower COA, each of which was represented by counsel in the prior litigation, signed the Memorandum of Understanding Regarding Settlement that contains the release that is now before us. The plain words of the settlement state that, subject to express exceptions contained in paragraph 1 of the agreement, "each party releases every other party from any and all claims which have been or ***could have been asserted in the*** [***litigation***]."[36] The right to control the nine courtyard parking spaces is not among the items listed as exceptions to the settlement and release. Thus, by its plain terms, the release applied to this claim of right.

¶30 Tower COA was aware of the issue regarding the nine courtyard parking spaces at the time of settlement and thus ***could have*** asserted this claim in its previous litigation with LP. As both *Jistel* and *Chadwick* demonstrate, the importance of settlement agreements trumps the nonwaiver provision included in RCW 64.34.030. Thus, as in *Jistel* and *Chadwick*, the trial court properly determined that it should enforce the plain words of the release contained in the 2003 settlement agreement. Doing so, it properly granted partial summary judgment to LP and dismissed the counterclaims of Tower COA.

¶31 Further, Tower COA's argument that it was not permitted to waive the rights of the condominium owners assumes that they had the right to control the nine parking spaces that are at issue in this case. For the reasons that we explain in more detail in the unpublished portion of this opinion, neither the Tower Declaration nor the Center Declaration can reasonably be read, individually or together, to vest any right to control these nine parking

---

[35] *Id.*

[36] Clerk's Papers at 348 (emphasis added).

spaces in anyone other than LP. Thus, the underlying premise of this Tower COA argument—that the individual unit owners have a right that has been infringed by the settlement and release—is false.

¶32 Additionally, Tower COA argues that because the Washington Condominium Act is "designed to protect condominium purchasers," it would be contrary to the act and against public policy to apply the release in a case such as this. This is unpersuasive.

¶33 First, Tower COA fails to identify any applicable contravening public policy here: the individual unit owners do not have a claim to the nine parking spaces. Second, as both the *Chadwick* and *Jistel* courts made clear, even where there *may* be other important public policies to consider, the policy of settlement is an important and often weightier one.

¶34 Tower COA next argues that the right to control the nine courtyard parking spaces was not contemplated by the Tower COA when it signed the 2003 settlement agreement. Thus, it claims that the plain language of the release that covers "all claims which have been or *could have been asserted in the [litigation]*" should not be given effect. We disagree.

■ ¶35 Traditional contract principles apply to the interpretation of a release.[37] The plain language of the release is not ambiguous. It broadly applies to *all* claims that could have been asserted, not just those asserted in the litigation.

¶36 Tower COA's argument rests on the false premise that the right to control the nine parking spaces was not manifest when Tower COA signed the settlement and release in 2003. The record belies this claim.

¶37 In February 2000, the president of Tower COA wrote to all the individual condominium unit owners concerning

---

[37] *Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 392, 739 P.2d 648 (1987).

"the drive court parking situation." He gave his assessment of the situation regarding the nine parking spaces now at issue in this case. He stated:

> [Tower COA] must function within the constraints of the Declaration and the Association Rules and Regulations . . . .
>
> According to these documents, there are specific parking spaces on P-1, 1, and in the drive court that belong to [Tower COA] as a Limited Common Element. They are not owned by any particular unit. *They are allocated by the Declarant for the exclusive use of a specific unit or units.* Each allocation is then registered on Schedule-B to the specific unit or units. This allows the space to remain allocated to the unit upon resale. Please note, the drive court spaces are treated in exactly the same fashion as the space(s) you may have allocated to your unit(s).
>
> *The Declarant hasn't allocated the spaces in the drive court.* As the [Tower COA] President I have asked the Declarant to provide a cost for allocating any or all of the drive court spaces. *I have also asked the Declarant to provide a cost for renting any or all spaces.*[38]

¶38 There is no dispute that the reference in the above passage to parking spaces "in the drive court" is to the nine parking spaces at issue in this case. Likewise, it is undisputed that his reference to the "Declarant" is a reference to LP, the declarant under the Tower declaration. Furthermore, this reference confirms what the Tower declaration plainly states: the Declarant allocates these nine parking spaces for the exclusive use of individual units. Finally, he states his request for a quotation of rental costs for the nine spaces.

¶39 In sum, at the time of this written communication, Tower COA had in mind the issue of control of the nine parking spaces at issue here. It acquiesced in the view that LP had the right to control these parking spaces under the terms and conditions of the Tower declaration.

---

[38] Clerk's Papers at 345 (emphasis added).

¶40 Pursuant to the request stated in the last paragraph of the above quotation, Tower COA entered into a lease in April 2000 with LP's agent for four of the nine parking spaces. The lease was for a term of one year and was automatically renewable on a month to month basis thereafter.[39] Tower COA paid rent on these four stalls from April 2000 through November 2007 and thereafter ceased payment.[40]

¶41 Based on the same understanding and acquiescence, two individual residential condominium unit owners leased two more of the nine courtyard spaces from LP for the period 2000 to 2005.[41] These were also leased on a month to month basis.[42]

¶42 This record thus evidences that Tower COA as well as two unit owners were aware of the issue of the right to control the nine parking spaces in 2000. Moreover, they acknowledged and acquiesced in LP's exclusive right to control these parking spaces by renting them. Whether their reading of the controlling documents was correct at that time is irrelevant. The relevant fact is that Tower COA was well aware of the issue of the right to control the nine spaces well before the 2003 settlement, which released all claims that could have been made. Likewise, Tower COA acknowledged and acquiesced in the view that LP had the exclusive right to control these nine spaces by renting the spaces over a period of time that began well before the 2003 settlement agreement and release. We also note that no individual owner has asserted in this lawsuit any contrary understanding.

¶43 Tower COA argues that it did not consult with an attorney prior to the 2000 memorandum. That makes no difference. It was represented during the 2001 litigation and at the time the parties signed the 2003 settlement

---

[39] *Id.* at 850.

[40] *Id.*

[41] *Id.*

[42] *Id.*

agreement and release.[43] The time of settlement is the material time for purposes of this argument, and Tower COA was represented at that time.

¶44 Tower COA relies on *Nevue v. Close*[44] and *Richardson v. Pacific Power & Light Co.*[45] to argue that because the parties did not contemplate the specific claim of ownership of the courtyard parking stalls in the 2003 release, their arguments are not barred. Both of these cases, dealing with the effect of a release in a personal injury context, are distinguishable.

¶45 In *Nevue*, the plaintiff's injuries were not apparent prior to her signature of the release and thus not barred by it. Nevue was involved in a car accident, and after the accident, she signed a general release, discharging Safeco Insurance from any other payment other than that outlined in the release.[46] Prior to signing the release, the only injury Nevue complained of was neck strain.[47] Only *after* signing the release did Nevue experience back pain.[48] The court noted that

> [h]ere there was a known minor neck sprain which was no longer bothering plaintiff when the release was signed. [At issue here] is a latent back injury *which developed after the release was signed that was not known or contemplated by either the plaintiff or the insurance adjuster*.[49]

The court thus held that the release did not automatically apply to bar compensation for Nevue's back pain.[50] "[A]s to an injury *unknown* to the plaintiff, and not within the

---

[43] *Id.* at 396.

[44] 123 Wn.2d 253, 867 P.2d 635 (1994).

[45] 11 Wn.2d 288, 118 P.2d 985 (1941).

[46] *Nevue*, 123 Wn.2d at 254.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 256 (emphasis added).

[50] *Id.* at 258.

contemplation of the parties to the release, the release should not be binding per se."[51]

¶46 Here, as we noted above, Tower COA knew of the issue regarding ownership of the nine parking stalls at the time of the settlement and release. Thus, unlike *Nevue*, there was "manifestation" of the issue before signing the settlement with the release. Consequently, the court's holding in *Nevue* is inapposite.

¶47 Similarly, the facts in *Richardson* are distinguishable from those here. Richardson was electrocuted on the job by a fallen power line.[52] His widow sued Pacific Power & Light after she signed a "Receipt of Release," acknowledging receipt from the phone company of full payment under its benefit plan and discharging it from all claims.[53] The court held that the release did not waive the widow's later suit.[54] But it based its holding on the fact that the "release" instrument was merely a receipt for money already payable to the widow.[55] That situation is decidedly different from this case. Here, there is no dispute that the release was exactly that, no less.

¶48 Tower COA also argues that neither party ever contemplated that the 2003 release would cover a later dispute about parking spaces. First, the broad language of the release does not support this more limited reading. In any event, whether the parties contemplated that the release itself would cover a later dispute about parking is not the issue. The fact is that both parties were ***aware of and contemplated the control of parking issue prior*** to the release. In *Nevue*, for example, the release did not void plaintiff's later claim for back injuries because it was

---

[51] *Id.* (emphasis added).

[52] *Richardson*, 11 Wn.2d at 295-96.

[53] *Id.* at 319.

[54] *Id.* at 320.

[55] *Id.*

*unknown* to her, *not* because she knew of it but thought the release would not apply to those particular problems.[56] Here, that is not the case.

¶49 Tower COA also argues that the plain words of the waiver cannot apply to any dispute about the interpretation of the declarations. But the plain language of the release is clear. It reads, "Each party releases every other party from any and all claims which have been or could have been asserted in the [litigation]."[57] And, the principles upon which Tower COA relies to argue that the release should mean something other than it does, ejusdem generis and noscitur a sociis, do not apply here. Under these maxims of statutory construction, general words followed by words of a particular meaning are not to be construed to their widest extent.[58] Instead, they are to be applied only to persons or things of the same general kind as those specifically mentioned.[59] But these principles require that the general and specific terms be connected in some way.[60] The "specific" words that preceded the general release here was a detailed list of the claims *excluded* from the release. Thus, the "general" words of the release had no connection to the "specific" words of the claims excluded.

¶50 In addition to granting partial summary judgment based on the release's effect, the trial court dismissed Tower COA's counterclaims in its order. Though the court did not specifically reference Tower COA's affirmative defenses in its summary judgment order, it later determined that they had been impliedly dismissed with the earlier dismissal of the counterclaims.

¶51 The affirmative defenses Tower COA pleaded in its answer were "unclean hands and inequitable conduct,"

---

[56] *Nevue*, 123 Wn.2d at 256.

[57] Clerk's Papers at 348.

[58] *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001).

[59] *Id.*

[60] *Dean v. McFarland*, 81 Wn.2d 215, 221, 500 P.2d 1244 (1972).

"misrepresentations and breaches of fiduciary duty," "[f]ailure to state a claim upon which relief can be granted," and the breach of "RCW 64.34.216[(1)](i) [and] (j) and RCW 64.34.228."[61] This record shows neither evidence nor argument for the first three affirmative defenses, nor for breach of RCW 64.34.216(1)(i). Therefore, we need not address them further.[62]

¶52 The remaining claim is grounded in a challenge over the right to control and allocate the nine spaces at issue in this case. At oral argument of this case, Tower COA properly conceded that its affirmative defenses and counterclaims were essentially the same.[63] Given the trial court's grant of partial summary judgment and dismissal of Tower COA's counterclaims, these remaining affirmative defenses were no longer viable.

¶53 The balance of this opinion has no precedential value. Accordingly, pursuant to RCW 2.06.040, it shall not be published.

APPELWICK, J., and ELLINGTON, J. PRO TEM., concur.

---

[61] Clerk's Papers at 12.

[62] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[63] Tower COA summarizes its affirmative defenses in its briefing as follows: "(1) inequitable conduct and unclean hands; (2) misrepresentation and breach of fiduciary duty; and (3) breach of RCW 64.34.216[(1)](i), (j) and RCW 64.34.228." Appellant Bellevue Pac. Tower Condo. Owners Ass'n Opening Brief at 16.